## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| **CHRISTOPHER M. POWELL,** | ) | |
| **Individually and on behalf of** | ) | |
| **all others similarly situated** | ) | **NO._____** |
| | ) | |
| **Plaintiff,** | ) | **CLASS ACTION COMPLAINT** |
| | ) | |
| **v.** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **NATIONAL COLLEGIATE** | ) | |
| **ATHLETIC ASSOCIATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## CLASS ACTION COMPLAINT

Plaintiff Christopher M. Powell (hereinafter referred to as "Powell"), individually and on behalf of all others similarly situated, by and through counsel, bring this class action complaint against Defendant National Collegiate Athletic Association ("NCAA") and alleges the following upon information, belief and investigation of counsel:

## NATURE OF THE ACTION

1.      This action seeks to recover damages for injuries sustained by Plaintiff as a direct and proximate result of the intentional and tortious conduct of the Defendant in connection with the failure to take effective action to protect players and/or inform players of the true risks associated with concussions, brain injury and brain trauma.

2.      Football is unquestionably an aggressive, physically demanding sport.  Injuries are common.  As such, it is vital to the safety of the players that the NCAA act reasonably, through research, studies and other means to identify the risks of serious injury associated with playing collegiate football; to keep the teams and players informed of the risks that they identify; to take

action based upon readily available information and research; and to take reasonable steps based upon their finding to protect their players.

3. The rash of head injuries has been noted in a wide variety of media, and was addressed recently by the NCAA in an announcement that it would clamp down on illegal blows to the head. But, as previously alluded to, this spate of head injuries is not a new problem at all. For decades, collegiate football players have been plagued by the devastating effects of concussions.

4. The NCAA's constitution states that college athletics shall be conducted in a manner designed to protect the physical and educational well being of college athletes. Article 2.2 of the NCAA Constitution specifically addresses the "Principle of Student-Athlete Well-Being" and provides in pertinent part:

> **2.2 The Principle of Student-Athlete Well-Being**
> Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student-athletes. (Revised: 11/21/05).
>
> * * *
> **2.2.3 Health and Safety**
> It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes. (Adopted: 1/10/95).

5. Article 2, §2.8.2 of the NCAA's constitution further states that the NCAA "shall assist the institution in its efforts to achieve full compliance with all rules and regulations…" This responsibility is reiterated on the NCAA's website, which places leadership responsibility on health and safety issues with the NCAA.

6. Furthermore, in its annually published Sports Medicine Handbook, the NCAA explicitly states that the "student-athletes rightfully assume that those who sponsor intercollegiate

2

athletics have taken reasonable precautions to minimize the risks of injury from athletics participation."

7.    The NCAA has breached its duty to protect college football players in the face of long-standing and overwhelming evidence regarding the need to do so.  The NCAA has ignored this duty and profited immensely from its inaction and denial, all to the detriment of the student football-playing athletes.

8.    The NCAA has failed to educate its football-playing athletes of the long term, life-altering risks and consequences of head impacts in football.  They have failed to establish known protocols to prevent, mitigate, monitor, diagnose and treat brain injuries.  As knowledge of the adverse consequences of head impacts in football has grown, the NCAA has never gone back to its form college football players to offer education or needed medical monitoring.  In the face of their overwhelming and superior knowledge of these risks, as compared to that of the athletes, the NCAA's conduct constitutes negligence and reckless endangerment.

9.    Specifically, the NCAA has failed to address and/or correct the coaching of tackling, checking or playing methodologies that cause head injuries; the NCAA has failed to educate coaches, trainers and student athletes as to the symptoms indicating possible concussions; the NCAA has failed to implement system-wide "return to play" guidelines for student athletes who have sustained concussions; the NCAA has failed to implement system-wide guidelines for the screening and detection of head injuries; the NCAA has failed to implement legislation addressing the treatment and eligibility of student athletes who have sustained multiple concussions in the course of play; the NCAA has failed to implement rules relating to the frequency of full contact practices; and the NCAA has failed to implement a

support system for student athletes who, after sustaining concussions, are left unable to either play football or even lead a normal life.

10.     The NCAA's conduct is particularly egregious in light of the fact that its policies and procedures – or lack thereof – leave former college football players like Plaintiff and members of the below-defined Class inadequately protected from sustaining, monitoring and recovering brain injuries at a particularly early and vulnerable point in their lives.  Unlike professional athletes, who at least have resources to pay for medical care necessitated by head injuries caused during their professional careers, collegiate football players typically range in age from 18-23 and are just beginning their adult lives.  For such NCAA student athletes, including Plaintiff and the putative Class, these injuries have long-term, debilitating effects, ranging from an inability to finish their education, to loss of memory, to depression, inability to sleep, severe headaches, severe mood swings, inability to concentrate and early-onset dementia.

11.     As such, Plaintiff seeks medical monitoring and financial recovery for the long-term and chronic injuries, financial losses, expenses and other losses suffered by the Plaintiff and members of the Class as a result of the NCAA's carelessness, negligence and concealment of information.

## JURISDICTION AND VENUE

12.     This Court has original diversity jurisdiction over this action under 28 U.S.C. § 1332(a) and (d) in that this is a class action in which the amount in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which numerous members of the proposed class are citizens of a state other than Defendant's state of citizenship.

13.     This Court has personal jurisdiction over the Plaintiff because he resides in and submits to the Court's jurisdiction.  This Court has personal jurisdiction over the Defendant

4

because the Defendant conducts substantial business in the District. Moreover, a substantial part of the evens or omissions giving rise to the claims asserted here occurred in this District.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c) and (d) because a substantial part of the events or omissions giving rise to the claims asserted here occurred in this District, and the NCAA resides, is found, has agents, or conducts substantial business in this District (and did so during the Class Period).

**PARTIES**

15. Plaintiff Christopher M. Powell is a natural person and a citizen of Kansas City, Jackson County, Missouri. Mr. Powell was a student at the University of Kansas and played college football from 1990 – 1994. He played as a blocking fullback. During his collegiate football career he experienced repeated traumatic head impacts and concussions. Mr. Powell suffered at least four (4) confirmed concussions during his collegiate career, one of which occurred at practice resulting in forty-eight (48) hours of memory loss. After graduation, Mr. Powell has experienced neurologic and cognitive deficits. Mr. Powell is at increased risk of latent brain injuries caused by repeated head impacts suffered during his college football career. As a result of the injuries sustained during his collegiate football career, Mr. Powell is in need of medical monitoring. Mr. Powell has also incurred out-of-pocket costs and continues to pay for ongoing medical treatment directly related to the repeated traumatic head impacts.

16. Defendant NCAA is an unincorporated association that acts as the governing body of college sports. Its principal office is located in Indianapolis, Indiana. According to its website, the NCAA oversees 88 championships in 23 sports. There are more than 400,000 student-athletes competing in three divisions at over 1,000 colleges and universities, i.e.,

member schools within the NCAA.  Through various licensing programs, the NCAA takes in, on average, over $750 million in revenues each year.

## FACTUAL ALLEGATIONS

### A. The NCAA Breached its Duty to Protect NCAA Football Players

17.     Historians report that the very existence of the NCAA evolved from the actions of President Teddy Roosevelt, who at the end of the 1905 college football season summoned the presidents of Harvard, Yale and Princeton to the White House to call for reform of the game to prevent brutality and unsportsmanlike conduct.  In 1905, 18 youths had died playing football and there were strong calls to ban the game.  Roosevelt's plea to the three university presidents created momentum for health and safety reform of college football that led to the formation of the Intercollegiate Athletic Association for the United States in 1906, which assumed the name NCAA in 1910.  Historians report that this specific concern for safety of college football players led to the creation of the NCAA.  From the turn of the 20th century to the present, the NCAA has assumed a duty to NCAA athletes to protect their health and safety.  These duties were confirmed over the decades and are reflected in the NCAA's constitution.

18.     The NCAA has failed to educate its football-playing athletes or coaches of the long term, life-altering risks and consequences of head impacts in football.  They have failed to establish known protocols to prevent, mitigate, monitor, diagnose and treat brain injuries.  As knowledge of the adverse consequences of head impacts in football has grown, the NCAA has never gone back to its former college football players to offer education or needed medical monitoring.  In the face of their overwhelming and superior knowledge of these risks, as compared to that of the athletes, the NCAA's conduct constitutes negligence and reckless endangerment.

6

## B.  A Primer on Head Injuries, Concussions and Neurological Damage

19.      Medical science has known for many decades that repetitive and violent jarring of the head or impact to the head can cause Traumatic Brain Injury ("TBI") and Mild Trauma Brain Injury ("MTBI") with a heightened risk of long term, chronic neuro-cognitive sequela.

20.      For example, Dr. Bennet Omalu, a renowned neuropathologist at the University of California, summarized the history of knowledge of "Head and Other Injuries in Youth, High School, College, and Professional Football," in his testimony before the U.S. Congress as follows:

> We have known about concussions and the effects of concussions in football for over a century.  Every blow to the head is dangerous. Repeated concussions and sub-concussions both have the capacity to cause permanent brain damage.  During practice and during games, a single player can sustain close to one thousand or more hits to the head in only one season without any documented or reported incapacitating concussion.  Such repeated blows over several years, no doubt, can result in permanent impairment of brain functioning especially in a child.

21.      The American Association of Neurological Surgeons (the "AANS") has defined a concussion as "a clinical syndrome characterized by an immediate and transient alteration in brain function, including an alteration of mental status and level of consciousness, resulting from mechanical force or trauma."  The AANS defines traumatic brain injury ("TBI") as:

> A blow or jolt to the head, or a penetrating head injury that disrupts the normal function of the brain.  TBI can result when the head suddenly and violently hits an object, or when an object pierces the skull and enters brain tissue.  Symptoms of a TBI can be mild, moderate or severe, depending on the extent of damage to the brain.  Mild cases may result in a brief change in mental state or consciousness, while severe cases may result in extended periods of unconsciousness, coma or even death.

22.      The Centers for Disease Control ("CDC") defines concussion as "a type of traumatic brain injury, or TBI, caused by a bump, blow, or jolt to the head

7

that can change the way your brain normally works.  Concussions can also occur from a fall or blow to the body that causes the head and brain to move quickly back and forth."

23.     Medical experts define a concussion as "a complex pathophysiological process affecting the brain, induced by traumatic biomechanical forces."  (Consensus Statement of Concussion in Sport: The 3rd International Conference on Concussion in Sport [Zurich 2008]).

24.     Recently, a group of concussion specialists considered all the available medical evidence on concussions and provided a more detailed definition.  "Concussion is defined as a traumatically induced transient disturbance of brain function and involves a complex pathophysiological process."  (American Medical Society for Sports Medicine position statement: Concussion in Sport. *Br J Sports Med.* 2013; 47:15-26).

25.     The mechanism of the injury flows from external forces (such as collisions between players or with the ground) acting on the head or anywhere on the body that transfer damaging energy to the brain cells, resulting in immediate injury to those cells.  This causes a breakdown of the cell structure and metabolism, and also impeded blood flow to the brain cells.  The damage results in the cells no longer functioning correctly to maintain their baseline activities and/or to recover.  A concussion results in symptoms and signs that negatively affect the concussed student athlete's health and well-being for a period ranging from days to several weeks.  During this recovery period the brain is much more vulnerable to subsequent and permanent injury – even from lesser force.

26.     The NCAA has known or should have known for many years that MTBI and TBI generally occur when the head either accelerates rapidly and then is stopped, or is rotated rapidly.

The results frequently include, among other things, confusion, blurred vision, memory loss, nausea, headaches and sometimes unconsciousness.

27. The NCAA has known or should have known for many years that medical evidence has shown that symptoms of MTBI and TBI can appear hours or days after the injury, indicating that the injured part has not healed from the initial blow.

28. The NCAA has known or should have known for many years that once a person suffers an MTBI, he is up to four times more likely to sustain a second one. Additionally, after suffering even a single sub-concussive or concussive blow, a lesser blow may cause MTBI or TBI, and the injured person requires more time to recover.

29. The NCAA has known or should have known for many years that college football players and their families were unaware of the serious risk posed to the players' long-term cognitive health, caused by repeated head impacts while playing football.

30. The NCAA has known or should have known for many years that clinical and neuropathological studies by some of the nation's foremost experts demonstrate that multiple head injuries or concussions sustained during a football player's career can cause severe and permanent cognitive problems such as depression, memory loss and early onset dementia.

31. The NCAA has known or should have known for many years that published peer reviewed scientific studies have shown that repeated traumatic head impacts (including sub-concussive blows and concussions) cause ongoing and latent brain injury. These injuries have been documented and associated with sports-related head impacts in both football and boxing.

32. The NCAA has known or should have known for many years that neuropathology studies, brain imaging tests and neuropsychological tests on many former football players have

9

clearly established that football players who sustain repetitive head impacts while playing the game have suffered and continue to suffer brain injuries that result in any one or more of the following conditions: early onset of Alzheimer's disease, dementia, depression, deficits in cognitive functioning, reduced processing speed, attention, and reasoning, loss of memory, sleeplessness, mood swings, personality changes and the debilitating and latent disease known as Chronic Traumatic Encephalopathy ("CTE"). CTE is also associated with an increased risk of suicide.

33. The NCAA has known or should have known for many years that CTE is found in athletes, including football players and boxers, with a history of repetitive head trauma. Conclusive studies have shown that this condition is prevalent in retired professional football players who have a history of head injury. The changes in the brain caused by repetitive trauma are thought to begin when the brain is subjected to that repetitive trauma, but symptoms may not appear until months, years or even decades after the last traumatic impact or the end of active athletic involvement.

34. Published peer-reviewed scientific studies have shown that concussive and sub-concussive head impacts while playing football are linked to significant risk of permanent brain injury. This head trauma, which includes multiple concussions, triggers progressive degeneration of the brain tissue. The brain degeneration is associated with memory loss, confusion, impaired judgment, paranoia, impulse control problems, aggression, depression, and eventually progressive dementia.

### C. The NCAA was and is in a Superior Position of Knowledge and Authority and Owed a Duty to Players Control

35. Since the early 1970s, the high incidence of concussions among student athletes in many different sports, including football, hockey and soccer, has been well known to the NCAA.

Further, based on studies that the NCAA *itself* paid for (as explained in detail below), the NCAA has been aware that a history of multiple concussions has been associated with greater risk of future brain defects in student athletes, including symptoms of post-traumatic brain injury such as headaches, dizziness, loss of memory, impulse control problems, TBI, MTBI and CTE.

36.     From its inception, the NCAA had a duty to protect football players from health and safety risks.  The NCAA held itself out as acting in the players' best interests.  Players and their families have relied on the NCAA to disclose relevant risk information and protect their health and safety.

37.     The NCAA's accumulated knowledge about head injuries to football players, and the associated health risks therefrom, was at all times superior to that available to the former college football players.

38.     In the early 2000s, the NCAA specifically became aware of the correlation between concussions and depression, dementia, and early onset Alzheimer's disease.  Despite this knowledge, the NCAA failed to act reasonably by developing appropriate means to identify at-risk players and guidelines or rules regarding return to play criteria.  The NCAA's inaction increased the risk of long-term injury and illness in student athletes, especially college football players.

### D.  The NCAA Knew the Dangers and Risks Associated with Repetitive Head Impacts and Concussions

39.     In the early 1980s, the Department of Neurosurgery at the University of Virginia published studies on patients who sustained MTBI and observed long-term damage in the form of unexpected cognitive impairment.  The studies were published in neurological journals and treatises within the United States.

11

40.     For example, in 1982, the University of Virginia and other institutions conducted studies on college football teams that showed that football players who suffered MTBI suffered pathological short-term and long-term damage.  With respect to concussions, the same studies showed that a person who sustained one concussion was more likely to sustain a second, particularly if that person was not properly treated and removed from activity so that the concussion symptoms were allowed to resolve.

41.     The same studies showed that two or more concussions close in time could have serious short-term and long-term consequences in both football players and other victims of brain trauma.

42.     In 1986, Dr. Robert Cantu of the American College of Sports Medicine published Concussion Grading Guidelines, which he later updated in 2001.

43.     By 1991, three distinct medical professionals/entities – Dr. Robert Cantu of the American College of Sports Medicine, the American Academy of Neurology, and the Colorado Medical Society – developed return-to-pay criteria for football players suspected of having sustained head injuries.

44.     The NCAA implemented an injury surveillance system in 1982.  In 1994, Randall W. Dick, Assistant Director of Sports Science for the NCAA, authored an article entitled "A Summary of Head and Neck Injuries in Collegiate Athletics Using the NCAA Injury Surveillance System" published by the American Society for Testing and Materials.  The article identified concussions as the most prevalent type of head injury and noted that evaluation of concussions may be a first step to the prevention of severe injuries.  The author cautioned that "[m]edical personnel should be educated on the diagnosis and treatment of such injuries in all sports and rules protecting the head and neck should be enforced."  In spite of this admonition, the NCAA

12

did not proceed to educate its active football players on the long term risks of concussions, nor provide necessary medical monitoring. Furthermore, the NCAA never reached out to its former football players to educate them or provide necessary medical monitoring.

45. In 1996, the NCAA Sports Science Safety Subcommittee on Competitive Safeguards and Medical Aspects of Sports discussed the concussion data in football and other sports and recognized the football helmet would not prevent concussions. No further steps were taken to educate present or former NCAA football players regarding the risks of concussions, or to provide needed medical monitoring.

46. In 1999, the National Center for Catastrophic Sport Injury Research at the University of North Carolina conducted a study involving eighteen thousand (18,000) collegiate and high school football players. The research showed that once a player suffered one concussion, he was three times more likely to sustain a second in the same season.

47. In 2000, a study presented at the American Academy of Neurology's 52nd Annual Meeting and authored by Dr. Barry Jordan, Director of the Brain Injury Program at Burke Rehabilitation Hospital in White Plains, New York, and Dr. Julian Bailes, surveyed 1,094 former NFL players between the ages of 27 and 86 and found that: (a) more than 60% had suffered at least one concussion in their careers, with 26% of the players having three or more and 15% having five or more; (b) 51% had been knocked unconscious more than once; (c) 73% of those injured said they were not required to sit on the sidelines after their head trauma; (d) 49% of the former players had numbness or tingling; 28% had neck or cervical spine arthritis; 31% had difficulty with memory; 16% were unable to dress themselves; 11% were unable to feed themselves; and (e) eight suffered from Alzheimer's disease.

48.     A 2001 report by Dr. Frederick Mueller that was published in the *Journal of Athletic Training* reported that a football-related fatality has occurred every year from 1945 through 1999, except for 1990.  Head-related deaths accounted for 69% of football fatalities, cervical spinal injuries for 16.3% and other injuries for 14.7%.  High school football produced the greatest number of football head-related deaths.  From 1984 through 1999, sixty-nine football head-related injuries resulted in permanent disability.

49.     In 2002, a prominent study published in the Archives of Clinical Neuropsychology entitled *Enduring Effects of Concussion in Youth Athletes* documented that there were enduring effects in youth who have experienced a history of two or more concussions.[1]  These include decreased overall neuropsychological functioning, as well as decreased mental speed.

50.     In 2003, the University of North Carolina, Chapel Hill, published a study, funded in part by the NCAA, which concluded that NCAA football players required an average of five to seven days after concussion for the their cognitive functioning to return to normal.[2]  The study concluded that *athletes required a full seven days after a concussion before completely regaining their pre-concussion abilities*.

51.     Despite this knowledge, the NCAA continues to allow college football players to return to play the very next calendar day after sustaining a concussion.  In practice, this means that a student athlete can be back on the field less than 24 hours after sustaining a serious brain injury – thereby placing the student athlete in serious medical jeopardy.

---

[1]  Moser, *et al.*, Archives of Clinical Neuropsychology, 17 (2002) 91-100
[2]  McCrea, et al., *Acute Effects and Recovery Time Following Concussions in Collegiate Football Players, The NCAA Concussion Study*, JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, Vol. 290, No. 19, November 19, 2003, at 2561.

14

52.     In another 2003 UNC-Chapel Hill study, again partially funded by the NCAA, the effects of multiple concussions sustained by a single athlete were examined.[3]  The study found that NCAA football players who had a history of concussions are at an increased risk of sustaining additional future concussions, and that those student athletes who had three previous concussions were at a three-fold greater risk of future concussions.  The study recommended that athletes with a high cumulative history of concussions should receive more information about the increased risk of repeat concussions before deciding whether to continue to play football.

53.     The study also concluded that the use of standardized assessment tools would assist medical staff in better determining how long student athletes should rest before returning to play.  Despite this knowledge, the NCAA has failed to implement any guidelines or rules pertaining to repeat concussions and failed to implement an educational program for athletes with a history of concussions who profess a desire to continue playing football.

54.     In 2005, UNC-Chapel Hill published a study that found a clear link between previous head injuries and the likelihood of developing mild cognitive impairment (MCI) and early onset Alzheimer's disease.[4]  In fact, the study found that players with three or more reported concussions were five times more likely to develop MCI, three times more likely to develop significant memory problems, and possessed an overall higher likelihood of developing early onset Alzheimer's disease.  The NCAA did not even acknowledge the study, let alone act on it or even alert its student athletes of these known risks.

---

[3]  Guskiewicz, et al., *Cumulative Effects Associated with Recurrent Concussion in Collegiate Football Players, The NCAA Concussion Study*, THE JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, Vol. 290, No. 19, November 19, 2003, at 2549.

[4]  Guakiewicz, et al., *Association between Recurrent Concussions and Late-Life Cognitive Impairment in Retired Professional Football Players*, NEUROSURGERY, Vo. 50, October 2005, at 719.

55.     Two years later, the NCAA ignored yet another UNC-Chapel Hill study, which found that recurrent concussions were linked to a heightened risk of depression in former football players.[5]  The results of that study showed that former football players who sustained three or more concussions were three times more likely to be diagnosed with depression.  Those with two or more concussions were one and one-half times more likely to be diagnosed with depression.

56.     In 2004, the NCAA "injury surveillance system" documented a high rate of concussions in football and other sports.  No action was taken by the NCAA to respond to this data in terms of educating former players or providing needed medical monitoring.

57.     The National Athletics Trainers Association ("NATA") published concussion management guidelines in 2004 repeating the need for return to play protections and symptom monitoring as earlier medical recommendations had outlined.

58.     The University of North Carolina's Center for the Study of Retired Athletes published survey-based papers in 2005 through 2007 that found a strong correlation between depression, dementia, and other cognitive impairment in NFL players and the number of concussions those players had received.

59.     In 2008, the University of Michigan's Institute for Social Research conducted a study on the health of retired players, with over 1,000 former NFL players taking part.  The results of the study, which were released in 2009, reported that "Alzheimer's disease or similar memory-related diseases appear to have been diagnosed in the league's former players vastly more often that in the national population – including a rate of 19 times the normal rate for men ages 30 through 49."

---

[5]  Guskiewicz, et al., *Recurrent Concussions and Risk of Depression in Retired Professional Football Players*, MED. SCI. SPORTS EXERC., Vol. 39, June 2007, at 903.

60. In June 2010, scientific evidence linked multiple concussions to yet another degenerative brain disease—Amyotrophic Lateral Sclerosis ("ALS"), commonly referred to as "Lou Gehrig's Disease."

61. As yet another example, the chart below, which was excerpted from an article in the 2010 *New England Journal of Medicine* entitled Traumatic Brain Injury – Football, Warfare, and Long-Term Effects, shows that even mild "traumatic brain injury" ("TBI") can have lasting consequences that are manifest later in the football player's life.



**Spectrum of Pathologic Features and Outcomes of Traumatic Brain Injury (TBI)**
In the left inset, Bielschowsky silver stain shows intraneuronal and extracellular neurofibrillary tangles in temporal cortex from a retired boxer with dementia pugilistica. The right inset shows diffuse Aß plaque deposits in temporal cortex from a subject who sustained severe TBI.

62.     In sum, the NCAA has known for decades that TBI and MTBI experienced in football can and does lead to long-term brain injury in football players, including, but not limited to, memory loss, dementia, depression, and CTE and its related symptoms.

63.     Not until 2010 did the NCAA take action by adopting a concussion management policy that delegated the concussion problem to its member schools.  This public relations maneuver, in the face of decades of knowledge coupled with inaction, was too little and too late to correct the inadequacies of its past conduct and its detrimental impact on former players.

### E.  Scientific and Medical Evidence Regarding the Need for Medical Monitoring and the Availability of Specific Medical Tests and Protocols for the Early Detection of Latent Brain Injury

64.     As stated *supra*, published peer-reviewed scientific studies have shown that repeated traumatic head impacts (including sub-concussive blows and concussions) cause ongoing and latent brain injury.  Such brain injury has been documented as a result of various causes, including sports-related head impacts in both football and boxing.

65.     Neuropathology studies, brain imaging tests, and neuropsychological tests on many former football players have established that football players who sustain repetitive head impacts while playing the game have suffered and continue to suffer brain injuries that result in any one or more of the following conditions: early onset of Alzheimer's Disease, dementia, depression, deficits in cognitive functioning, reduced processing speed, attention, and reasoning, loss of memory, sleeplessness, mood swings, personality changes, and CTE.

66.     Repeated traumatic head impacts suffered by former football players have microscopic and latent effects on the brain.  These impacts twist, shear, and stretch neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as the Tau protein.  Among other things, the gradual buildup of

Tau protein – sometimes over decades – causes CTE, which is the same phenomenon as boxer's encephalopathy (or punch drunk syndrome), which was studied and reported in the Martland study in 1928. CTE is also associated with an increased risk of suicide, dementia, and a progressive cognitive decline and dysfunction.

67.     Accordingly, the repeated traumatic head impacts suffered by former NCAA football players exposed them to a subtle and repetitive change within the brain on the cellular level including increased levels of the Tau protein which is known to increase the risk of brain injury.

68.     Plaintiffs and members of the Class were exposed to a significant number of sub-concussive blows and concussions as a result of their college football careers.  The general public does not experience this type of brain trauma.

69.     Historically, the NCAA has dismissed repeated sub-concussive blows and concussions as "dings" and having one's "bell rung," and concealed facts that would assist the members of the Class in being able to obtain adequate brain injury diagnosis, management, and treatment to facilitate recovery and rehabilitation.

70.     The NCAA's inaction and denial as to the risks of chronic sub-concussive blows and concussions has increased the risks for members of the Class to brain injury and its sequela including cognitive, mental health, and neurological disorders during the years following their collegiate football careers.

71.     Management of concussions requires a gradual, multistep process involving baseline testing and neurocognitive examination.

72.     For sports, such as football, in which repeated blows to the head are unavoidable, proper concussion assessment and management is paramount for preventing and mitigating long-term consequences.

73.     Medical monitoring for latent brain injury identifies deficits that are amenable to treatment through medical, cognitive, psychological and behavioral counseling (for the patient and his spouse and family), as well as through pharmaceutical treatment, lifestyle modifications, and other therapeutic interventions.

74.     Serial testing of cognitive functioning for early signs or symptoms of neurologic dysfunction, and serial brain imaging for signs of injury or disease, is medically necessary to assure early diagnosis and effective treatment of brain injury.

75.     Medical monitoring for latent brain injury is highly specialized and different from the medical care that is normally recommended to other men of a similar age, in the absence of a history of chronic repeated sub-concussive impacts and concussions.

76.     Well-established and specialized medical monitoring procedures exist to provide early diagnosis of brain injury which greatly enhances successful treatment, rehabilitation, and prevention or mitigation of cognitive, psychological, and behavioral deficits.

77.     Such procedures include serial brain imaging studies and neuropsychological evaluations targeted on identifying the deficits associated with chronic and repeated sub-concussive blows and concussions experienced by members of the Class.

78.     Medical monitoring for latent brain injury is reasonably necessary to provide for early diagnosis, leading to benefits in treatment, management, rehabilitation, and prevention or mitigation of damage.

### F. The NCAA Fraudulently Concealed Information on the Long-Term Effects of Repeated Head Impacts in Football

79.     Despite its awareness of these dangerous practices and the increased risk of head injury to the players, during the 1970s, 1980s, 1990s and 2000s the NCAA turned a blind eye to the players being coached and trained to use all portions of their helmet to block, tackle, butt, spear, ram and/or injure opposing players by hitting with their helmeted heads, and instead elevated its financial self-interest above the physical safety of its student athletes.

80.     As noted above, the NCAA knew of the head trauma risks of football players for several decades, yet took no action to educate its football players of these risks. Similarly, they took no action to provide medical monitoring to prevent, mitigate, monitor, diagnose, or treat these injuries.

81.     In August 2010, the NCAA implemented a concussions management plan ("CMP"); however, this plan failed to provide the necessary education and disclosure of head trauma risks, and needed medical monitoring, to former players.

82.     Prior to passage of the NCAA CMP, Plaintiffs and members of the Class were unaware that the conduct of the NCAA may have caused them to be at an increased risk for developing chronic brain injury symptoms, including, but not limited to, dementia and/or Alzheimer's disease.

83.     Plaintiffs and members of the Class did not have a reasonable basis to know or believe that the aforementioned harm was caused by the concealment, neglect and/or misconduct of the NCAA.

84.     Over the past four decades, the NCAA has actively concealed any correlation between on-field concussions, its return-to-play policies and the chronic mental illnesses and maladies suffered by former college football players, including the Plaintiffs and the Class.

85.     Even today, by failing to implement appropriate policies to prevent, manage, mitigate and remedy head injuries and concussions sustained by its student athletes, the NCAA continues to ignore and actively conceal the repeated warnings and patterns of injury of which the NCAA has actual knowledge.

86.     Although the debilitating effects of concussions and other head injuries have already manifested for many former college football players, there are many others who have sustained such injuries as a direct result of the NCAA's failures and inactivity described above, but whose symptoms have only partially manifested or not yet manifested at all.

87.     The NCAA has failed to establish a proper and adequate methodology to monitor and detect when players suffer concussive or sub-concussive injury in practice or game play. This has increased the risk of injury that will materialize in the future.

88.     As a result, Plaintiff and members of the Class require medical monitoring to detect the manifestation of post-injury symptoms.

89.     The NCAA was under a continuing duty to disclose the true character, quality and nature of the aftereffects of head injuries.  Because of the NCAA's deceitful and fraudulent concealment of the true character, quality and nature of these injuries, the NCAA is estopped from relying on any statute of limitations defense.

## CLASS ACTION ALLEGATIONS

90.     Plaintiff brings this action on behalf of himself and, under Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), as representative of a Class defined as follows:

> All former NCAA football players who sustained a concussion(s) or suffered concussion-like symptoms while playing football at an NCAA school, and who have, since ending their NCAA careers, developed chronic headaches, chronic dizziness, sleeplessness or dementia or Alzheimer's disease and/or other physical, cognitive and mental

22

problems as a result of the concussion(s) suffered while a player (the "Class") and who did not play in the NFL.

Excluded from the Class are the NCAA and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and any immediate family members thereof.

91.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

92.     The members of the Class are so numerous and geographically dispersed that joinder is impracticable.  Plaintiff  believes that the Class includes hundreds if not thousands of persons who have developed mental or physical problems as a result of the sustaining traumatic brain injuries, concussions or concussion like symptoms while playing in a collegiate football game, and that the locations of such persons is geographically dispersed throughout the country. Although the exact number and locations of such persons is unknown to Plaintiff at this time, records in the possession of the NCAA will contain information on the identities and locations of such parties.

93.     Numerous questions of law and fact are common to all members of the Class because the Class Members all played under the same rules and practices and they all suffered traumatic brain injuries, concussions or concussion like symptoms while playing under these rules and practices.  Such common questions include:

        a.      whether the NCAA had a duty to provide warnings to players about the injuries associated with repeated brain trauma, concussions and concussion like symptoms;

b.     whether the NCAA willfully and wantonly concealed evidence related to the injuries associated with repeated brain trauma, concussions and concussion like symptoms; and

c.     whether the NCAA had a duty to enact rules that protect players from the dangers of sustaining one or more traumatic brain injuries, concussions or concussion like symptoms in a football game.

94.    Plaintiff's claims are typical of all the claims of the members of the Class, and the claims of the Named Plaintiff originate from the same practices on the part of the NCAA.  For example, Plaintiff Chris Powell is a person who sustained one or more traumatic brain injuries, concussions, or suffered concussion like symptoms, while playing collegiate football and has developed mental or physical problems as a result of the traumatic brain injuries, concussions or concussion like symptoms.  As a result, Plaintiff has sustained damages as a result of the NCAA's wrongful conduct.

95.    Plaintiff will fairly and adequately protect and represent the interests of the Class. The interest of the Plaintiff is coincident with, and not antagonistic to, those of the other Class Members.

96.    Plaintiff is represented by counsel with extensive experience in the prosecution of class action litigation, and with particular experience with class action litigation involving medical injuries.

97.    Class action treatment is also appropriate because the common questions of the law and fact identified above predominate over questions affecting only individual members.

98.    Class action treatment is also the superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated

persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender, and will prevent inconsistent rulings or decisions.

99.     Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION
### COUNT 1
### NEGLIGENCE
**(Plaintiff and Class vs. Defendant)**

100.     Plaintiff repeats and re-alleges each of the allegations contained in the foregoing paragraphs.

101.     The NCAA has historically assumed a duty to protect the health and safety of its football players.  By taking such steps to protect the health and safety of its players, a relation of trust and confidence between the NCAA and its players existed, which gave rise to a duty upon the NCAA not to conceal material information from its players, and to act to protect the health and safety of its players.

102.     The NCAA had superior knowledge of such material information concerning the increased risks of repeated traumatic head impacts to its players, such material information was not readily available to the Plaintiff or members of the Class, and the NCAA knew or should have known that the Plaintiff and members of the Class were acting and playing based upon mistaken beliefs created by the NCAA's concealment, inaction and denial.

103.     At all relevant times, the NCAA had a duty toward Plaintiff and the members of the Class to supervise, regulate, monitor and provide reasonable and appropriate rules to minimize the risk of injury to the players.

104.    The NCAA players, including the Plaintiff and members of the Class, did reasonably and justifiably rely upon the NCAA to protect their health and safety.

105.    The NCAA acted carelessly and negligently in its position as the regulatory body for collegiate football teams and its student athletes, including the Plaintiff and members of the Class.  The NCAA knew or should have know that its actions or its inaction in light of the rate and extent of concussions reported and made known to the NCAA would cause harm to players in both the short and long-term.

104.    The NCAA was careless and negligent by breaching the duty of due care it assumed for the benefit of the Plaintiff and the Class, both generally and in the following particular respects:

a.    Failing to educate college football players concerning symptoms that may indicate a concussion has occurred;

b.    Failing to warn of the risk of unreasonable harm resulting from repeated concussions;

c.    Failing to disclose the special risks of long-term complications from repeated concussions and return to play;

d.    Failing to disclose the role of repeated concussions in causing chronic life-long cognitive decline;

e.    Failing to promulgate rules and regulations to adequately address the dangers of repeated concussions and a return-to-play policy to minimize long-term chronic cognitive problems;

e.    Misrepresenting pertinent facts that players needed to be aware of to make determinations of the safety of return to play;

f.    Concealing pertinent facts;

g.    Failing to adopt rules and reasonably enforce those rules to minimize the risk of players suffering debilitating concussions; and

h.    Other acts of negligence or carelessness that may materialize during the pendency of this action.

105.    The Plaintiff and members of the Class have each sustained past medical expenses and will in all likelihood incur future medically related costs associated with the harm sufferance and injuries and disability referenced above.

106.    The Plaintiff and members of the Class have in the past experienced, and they may in the future suffer, from an assortment of problems associated with the harm and injuries described including, but not limited to, headaches, dizziness, loss of memory, depression, impulsivity to anger, cognitive dysfunction, employment impairment, limitations in physical activities, embarrassment, and loss of the pleasures of life, among other things.

107.    As a result of the foregoing, Plaintiff and members of the Class have suffered damages and will in the future suffer damages caused by the misconduct of the NCAA.

108.    The Plaintiff and members of the Class are entitled to damages in an amount to be determined at trial.

109.    In addition, Plaintiff has no adequate remedy at law in that monetary damages alone cannot compensate him for the risk of long-term physical and economic losses due to concussions and sub-concussive injuries.  Plaintiff and members of the Class were recklessly endangered during and subsequent to their playing careers, and are entitled to injunctive relief, as allowed by law, from the NCAA in the form of a Court-supervised, NCAA-funded, comprehensive medical monitoring program for Plaintiff and the Class, which would facilitate the early diagnosis and adequate treatment of brain injury for Plaintiff and members of the Class.

## COUNT II
### FRAUDULENT CONCEALMENT
#### (Plaintiff and Class vs. Defendant)

110.    Plaintiff repeats and re-alleges each of the allegations contained in the foregoing paragraphs.

27

111.     The NCAA concealed facts and information which were material.  As more fully described above, since the early 1970s, the high incidence of concussions among student athletes in many different sports, especially football, has been well known to the NCAA.  Further, based on studies that the NCAA *itself* paid, the NCAA has been aware that a history of multiple concussions has been associated with greater risk of future brain defects in student athletes, including symptoms of post-traumatic brain injury such as headaches, dizziness, loss of memory, impulse control problems, and Chronic Traumatic Encephalopathy.  Moreover, in the early 2000s, the NCAA specifically became aware of the correlation between concussions and depression, dementia, and early onset Alzheimer's disease.

112.     Through concealment of material facts, the NCAA intended to induce a false belief, under circumstances creating a duty to speak.  The NCAA specifically intended to induce a false belief in its student athletes that they should continue to play and should not be prevented from playing their respective sports even after a concussion or several concussions that should have required time to heal.

113.     Plaintiff could not have discovered the truth through reasonable inspection or inquiry, or were prevented from doing so.  Plaintiff was under the care and treatment of the NCAA and school trainers and doctors, and justifiably relied on their silence as representing that the facts did not exist.

114.     The concealed information was such that Plaintiff would have acted differently if they had been aware of the material facts.  Plaintiff would not have continued to play, or would have taken additional time to allow their brain injuries to heal before returning to play.  Despite the NCAA's knowledge, the NCAA failed to act reasonably by developing appropriate means to identify at-risk players and guidelines or rules regarding return to play criteria.  The NCAA's

inaction increased the risk of long-term injury and illness in student athletes, especially football players.

115.    As a direct and proximate result of the NCAA's conduct, Plaintiff and members of the Class have suffered harm described above, and/or will suffer future injuries and damages that have not yet fully manifested.

**COUNT III**
**UNJUST ENRICHMENT**
**(Plaintiff and Class vs. Defendant)**

116.    Plaintiff repeats and re-alleges each of the allegations contained in the foregoing paragraphs.

117.    The NCAA and its members enjoy enormous revenues from college sports, including by way of example in football, a 15-year deal between the Southeast Conference (SEC) and ESPN estimated in value at $2.25 billion (Smith & Ourand, 2008), the $2.8 billion expected to be generated over the next 25 years by the Big Ten Network (Ourand & Smith, 2008), and the newly inked Pac 12 television deal that will generate $3 billion over the next 12 years (Ubben, 2011). Individual campus deals, such as the Longhorn Network developed between the University of Texas and ESPN, has a projected income profile of $300 million over the span of the next 20 years (Haurwitz, 2011).

118.    It is unjust to allow the NCAA and its members to earn revenues and retain the benefits of athletes' services while refusing to pay medical expenses of sports-related injuries whose treatment is required post college career.

## COUNT IV
## MEDICAL MONITORING
### (Plaintiff and Class vs. Defendant)

119.    Plaintiff repeats and re-alleges each of the allegations contained in the foregoing paragraphs.

120.    Plaintiff seeks to certify a Medical Monitoring Class.

121.    During his NCAA career, Plaintiff and the members of the Class experienced repeated traumatic head impacts, including sub-concussive blows and concussions, with greater frequency and severity than the general population of men of a similar age.

122.    The repeated traumatic head impact injuries, including sub-concussive blows and concussions, experienced by Plaintiff and members of the Class during their respective NCAA careers are known and proven to be hazardous because they increase the risks of developing neurodegenerative disorders and diseases, including but not limited to CTE, MCI, Alzheimer's disease and other similar cognitive-impairing conditions.

123.    The NCAA was fully aware of—yet concealed the dangers of exposing players, including Plaintiffs and members of the Class, to—increased risks of repeated traumatic head impacts and developing neurodegenerative disorders and diseases.  The NCAA had a duty to protect the health and safety of NCAA football players.  The NCAA failed to educate its football players regarding the risks of repeated head trauma in football, and failed to require actions to prevent, mitigate, monitor, diagnose, and treat brain injuries.  By such negligent conduct, the NCAA breached its duties of care to the Plaintiff and members of the Class, and caused the increased risks to the former players giving rise to the need for medical monitoring.

124.    As a proximate result of NCAA's negligent conduct, Plaintiff and members of the Class have experienced increased risks of the sequela of repeated traumatic head impacts,

including developing serious latent neurodegenerative disorders and diseases, including but not limited to CTE, MCI, Alzheimer's disease or similar cognitive-impairing conditions.

125.     Monitoring procedures exist that comport with contemporary scientific principles and make possible early detection of the cognitive impairments and conditions that Plaintiff and members of the Class are at increased risks of developing.  Such monitoring, which includes but is not limited to baseline exams, diagnostic exams, and behavioral and pharmaceutical interventions, will prevent or mitigate the injuries, and enable treatment of the adverse consequences of the latent neurodegenerative disorders and diseases associated with the repeated traumatic head impacts described herein.

126.     The monitoring procedures set forth above are fundamentally different from and more extensive than the normally prescribed medical treatment and/or diagnostic procedures for adult males.

127.     As set forth above, the monitoring procedures are reasonably necessary according to contemporary scientific principles, to enable Plaintiff and members of the Class to obtain early detection and diagnosis of the cognitive impairments and conditions that they are at increased risks of developing as a result of the NCAA's tortious conduct described herein.

128.     By monitoring and testing former (and current) NCAA football players who are believed to have suffered a concussion or sub-concussion while playing or practicing, the risk of each such player suffering long-term injuries, disease and losses as described above will be significantly reduced.

129.     Plaintiff and members of the Class therefore seek an injunction creating a Court-supervised, NCAA-funded, comprehensive medical monitoring program for Plaintiff and the members of the Class, which would facilitate the early diagnosis and adequate treatment in the

event that a neurodegenerative disorder or disease is diagnosed in Plaintiff or members of the Class.

130.     Accordingly, the NCAA should be required to establish a medical monitoring program that includes, among other things:

    a.  Establishing a trust fund, in an amount to be determined, to pay for the medical monitoring of all past, current and future NCAA football players, as frequently and appropriately as necessary;

    b.  Notifying all Class Members in writing that they may require frequent medical monitoring; and

    c.  Providing information to treating team physicians to aid them in detecting concussion or sub-concussions and to assist them in determining when the student athlete is subjected to an increased risk of harm.

131.     Plaintiff and the members of the Class have no adequate remedy at law in that monetary damages alone cannot compensate them for the increased risks of long-term physical and economic losses associated with brain injury.  Without a Court-supervised, NCAA-funded, comprehensive medical monitoring program as described herein, the Plaintiff and the members of the Class will continue to face increased risks of injury and disability, without proper diagnosis and opportunity for rehabilitation.

## COUNT V
## BREACH OF CONTRACT
### (Plaintiff and Class vs. Defendant)

132.     Plaintiff repeats and re-alleges each of the allegations contained in the foregoing paragraphs.

133.     Plaintiff and the NCAA were parties to a contract by virtue of the NCAA's requirement that each student-athlete complete a form affirming that he has read and will abide by the NCAA regulations, which expressly encompass the NCAA Constitution, Operating Bylaws, and Administrative Bylaws (collectively, "NCAA Regulations").

134.    In the NCAA Regulations, the NCAA expressly promises to enforce the requirement that "each member institution protect the health of, and provide a safe environment for, each of its participating student athletes," NCAA Const. Art. 2 § 2.2.3.

135.    Furthermore, in the NCAA Sports Medicine Handbook, the NCAA explicitly states that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risks of injury from athletics participation."

136.    The NCAA has breached its contractual commitment to former NCAA football players by failing to educate football players about the long-term, life-altering risks and consequences of head impacts in football; by failing to establish known protocols to prevent, mitigate, monitor, diagnose, and treat brain injuries; and by failing to go back to its former NCAA football players to offer education and needed medical monitoring.

137.    To the extent that the Court finds that no contract exists between Plaintiff and the NCAA, then the NCAA and its member institutions were parties to a contract. As an express condition of their membership in the NCAA, each institution must agree to abide by all NCAA Regulations. These NCAA Regulations thus constitute a contract between the NCAA and its member regulations.

138.    Plaintiff and members of the Class are third-party beneficiaries of the contract between the NCAA and its members, because the parties to the contract intended to benefit student athletes through provisions of the contract, including the following provision of the NCAA Constitution:

> **2.2.3 Health and Safety.**  It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes. *(Adopted: 1/10/95.)*

139.     The NCAA breached this contract by failing to enforce the requirement that each member institution protect the health of student-athletes.  This breach was effectuated by the NCAA's failure to educate football players about the long-term, life-altering risks and consequences of head impacts in football; to establish known protocols to prevent, mitigate, monitor, diagnose, and treat brain injuries; and to go back to its former NCAA football players and offer education and needed medical monitoring.

140.     Plaintiff and the members of the Class therefore seek an injunction creating Court-supervised, NCAA-funded, comprehensive medical monitoring program for plaintiff and the members of the Class, which would facilitate the early diagnosis and adequate treatment in the event that a neurodegenerative disorder or disease is diagnosed in Plaintiff or members of the Class.

## JURY DEMAND

141.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims in this Complaint so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and members of the Class pray for judgment with respect to the Complaint as follows:

A.     Certification of the proposed Class pursuant to Federal Rules of Civil Procedure Rule 23(a), (b)(2) and (b)(3);

B.     Designation of Plaintiff as representatives of the proposed Class and designation of Plaintiffs' counsel as Class counsel;

C.     Grant an injunction and/or other equitable relief against the NCAA and in favor of Plaintiff for the requested medical monitoring;

D.     Award Plaintiff and the Class compensatory damages, the amount of which is to be determined at trial;

34

E.  Award Plaintiff and the Class prejudgment interest on all damages;

F.  Grant Plaintiff and the Class equitable relief in the nature of the disgorgement, restitution, and the creation of a constructive trust to remedy the NCAA's unjust enrichment;

G.  Award Plaintiff and the Class their costs and expenses in this litigation, including reasonable attorneys' fees and expert fees;

H.  Award Plaintiff and the Class all such other and further relief as may be just, equitable and proper under the circumstances.

**Respectfully submitted,**

**BARTIMUS, FRICKLETON, ROBERTSON & GORNY, P.C.**

**BY:    /s/ Michael Rader**
**MICHAEL C. RADER          MO BAR #49117**
**JAMES P. FRICKLETON        MO BAR #31178**
**EDWARD D. ROBERTSON, JR.  MO BAR #27183**

**11150 OVERBROOK ROAD, SUITE 200**
**LEAWOOD, KS  66211-2298**
**(913) 266-2300**
**(913) 266-2366          FAX**

**Email: mrader@bflawfirm.com**
**jimf@bflawfirm.com**
**chiprob@earthlink.net**